# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.K.A and T.B.F, | |
| Plaintiffs, | |
| -against- | |
| UNITED STATES OF AMERICA; U.S. DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO N. MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and PATRICK LECHLEITNER, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, | Case No.: 1:23-cv-02273-APM |
| Defendants. | |

## FIRST AMENDED COMPLAINT

### INTRODUCTION

1.     This case is about the negligent and wrongful acts and omissions of officers of the United States of America, egregious failures to follow and implement policies and regulations within agencies of the United States, and the resulting damages they caused to two asylum seekers who were detained in immigration detention and forcibly returned to Cameroon.

2.     Plaintiffs bring claims against the United States under the Federal Tort Claims Act because individual officers of Immigration and Customs Enforcement ("ICE") undertook severe and retaliatory abuse of Plaintiffs and other Cameroonians while they were in immigration

detention, out of retaliation for their peaceful hunger-striking protests and because high-level officers at the headquarters of the Department of Homeland Security ("DHS") and ICE have been well-aware of persistent abuses by officers against hunger-striking individuals in ICE custody – including the range of abuses used against Plaintiffs and other Cameroonians in the period relevant to this complaint – yet have done nothing to remediate these abuses or enforce existing agency policies and regulations that proscribe the abuses at issue here. The case is also brought against DHS and ICE under the Administrative Procedure Act ("APA"), for their failure to follow agency guidelines, in violation of the *Accardi* doctrine.

3.    Plaintiffs are two Cameroonian nationals who came to the United States seeking asylum from persecution by the Cameroonian government. They are members of Cameroon's English-speaking, Anglophone minority, which has been targeted by the Cameroonian government security forces since 2017, resulting in a massive humanitarian crisis.[1]

4.    After requesting asylum in the U.S., Plaintiffs were placed in immigration detention in the custody of DHS and ICE, during which they experienced numerous abuses at the hands of U.S. government officers and agencies in violation of the laws of the United States. In particular, Plaintiffs were pepper sprayed in confined spaces, subjected to solitary confinement, negligently and improperly confined in restraints, and subjected to medical neglect that caused them severe physical and mental harm.

5.    After months of detained Cameroonian asylum seekers' speaking out about horrid detention conditions and engaging in hunger strikes, DHS and ICE organized two mass deportation flights, including a flight on October 13, 2020, which Plaintiffs were on, from the Fort Worth

---

[1]    *See Cameroon, Events of 2022*, Human Rights Watch (2023), World Report 2023, https://www.hrw.org/world-report/2023/country-chapters/cameroon.

Alliance Airport in Fort Worth, Texas to Douala, Cameroon. Despite protests from advocates and the Plaintiffs that they would be arrested or seriously harmed upon their return to Cameroon, ICE agents cruelly shackled Plaintiffs and threatened them with violence to force them onto the deportation flight back to Cameroon.

6.      During this time, DHS and ICE received and responded to complaints, Congressional letters, media inquiries, State Department communications, and other correspondence regarding the abuses in detention and the deportation flight, and—rather than halt the deportation flight—they designated them as "Special High Risk Charters." This designation placed a SWAT team of officers on the flight who were predisposed to using force and unnecessary restraints, including using them as a threat and warning to those being deported not to question the officers in any way.

7.      Defendants' treatment of Plaintiffs and other Cameroonian asylum seekers is part of a historical practice of abuse and discrimination by ICE. Black asylum seekers from Africa and the Caribbean have repeatedly reported experiencing serious harms in immigration detention in the U.S., including racist targeting, physical and verbal abuse, violent coercion to force them to sign deportation papers, and the denial of medical and other necessary care.

8.      In comparison to others, Black migrants in ICE detention are subjected to higher bond payments, forcing them to remain in ICE custody for disproportionately prolonged periods of time.[2] Moreover, according to a report by Human Rights Watch, numerous deported Cameroonians experienced "communication barriers, alleged asylum officer errors and

---

[2]      *See Black Immigrant Lives Are Under Attack*, RAICES (July 2020), https://www.raicestexas.org/2020/07/22/black-immigrant-lives-are-under-attack/.

misconduct, possible factual inaccuracies and lack of impartiality by immigration judges, and limited access to legal counsel and information" in the adjudication of their asylum claims.[3]

9.     Agency records concerning the October and November 2020 deportation flights to Cameroon, produced through FOIA litigation, revealed that federal officials hold disturbing and racist attitudes towards Africa and treat mass deportations as a sport.[4]  In one email chain entitled "Attaches for Removal," ICE officials used sports terms to refer to missing out on the deportation of African immigrants due to lack of travel documents: "[i]t sure is... don't need to be 0-2... still losing sleep over the last Gabon [deportation] we had to drop."[5]

10.     Human Rights Watch has extensively documented allegations of discrimination and torture against Cameroonian and other Black migrants while in ICE custody, and the culpability of U.S. government officials in heightening the risk of harm Cameroonians faced by Cameroonian authorities.[6]  Human Rights Watch documented allegations of "ICE refusing to allow people to remove asylum documents from their luggage prior to deportation, resulting in their de facto transfer to the Cameroonian authorities."[7]  The failure to do so – according to ICE's own protocol – left these asylum seekers at an obviously foreseeable and heightened risk of

---

[3]     *U.S.: Deported Cameroonian Asylum Seekers Suffer Serious Harm*, Human Rights Watch (Feb. 10, 2022), https://www.hrw.org/news/2022/02/10/us-deported-cameroonian-asylum-seekers-suffer-serious-harm.
[4]     Center for Constitutional Rights, *Briefing Guide: The U.S. Government's Systematic Mistreatment Of Cameroonian And Other Black Migrants* (Feb. 6, 2023), https://ccrjustice.org/sites/default/files/attach/2023/02/CCR%20SPLC%20Proj%20South%20Briefing%20Guide%202-6-23.pdf.
[5]     Center for Constitutional Rights, *Briefing Guide: The U.S. Government's Systematic Mistreatment Of Cameroonian And Other Black Migrants* (Feb. 6, 2023), https://ccrjustice.org/sites/default/files/attach/2023/02/CCR%20SPLC%20Proj%20South%20Briefing%20Guide%202-6-23.pdf.
[6]     *U.S.: Deported Cameroonian Asylum Seekers Suffer Serious Harm*, Human Rights Watch (Feb. 10, 2022), https://www.hrw.org/news/2022/02/10/us-deported-cameroonian-asylum-seekers-suffer-serious-harm.
[7]     *Id.*

persecution upon return to their home country. Human Rights Watch also found that Cameroonian deportees were subjected to "serious human rights violations including rape, torture and other physical abuse, arbitrary arrest and detention, inhuman and degrading treatment in detention, extortion, and threats" at the hands of the Cameroonian government.[8]

11.     High level officials at ICE and DHS have been repeatedly made aware – through media reports, congressional letters and inquiries and civil rights complaints – about abusive forms of ICE retaliation, including gratuitous and unlawful use of pepper spray and punitive solitary confinement, leveled against individuals who engage in peaceful hunger strikes, including the Cameroonians retaliated against here.

12.     The persistent failure of high-level DHS and ICE officials to comply with their own binding policies and hold individual officers accountable for the abuse Plaintiffs and others complained of contributed to a culture of impunity, violence, and racism among individual ICE officers and led to Plaintiffs' mistreatment.

13.     Plaintiffs bring this action under the FTCA and APA seeking redress for the extraordinary harms they suffered at the hands of DHS and ICE officials.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction in this case, which arises under federal law, pursuant to 28 U.S.C. § 1346(b) because this is a civil action against the United States for personal injury caused by the negligent and wrongful acts and omissions of government employees.

15.     This action is also brought under the Administrative Procedure Act ("APA") because it seeks review of agency action against Plaintiffs. Jurisdiction is proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

---

[8]     *Id.*

16.     This Court can enter declaratory, injunctive, and further necessary or proper relief to recognize and remedy the underlying violations under 28 U.S.C. §§ 2201 and 2202 (declaratory relief), 5 U.S.C. § 706 (agency action), and the Court's inherent equitable powers.

17.     On August 9, 2020, Plaintiffs submitted an administrative claim to DHS, ICE, and the Department of Health and Human Services ("HHS") pursuant to 28 U.S.C. § 2675(a). On February 7, 2023, DHS and ICE denied Plaintiffs' administrative claims, which exhausted applicable agency processes and thus, fulfilled the prerequisite for the filing of this action under 28 U.S.C. § 2401(b).  Accordingly, Plaintiffs have exhausted all potential administrative remedies.

18.     Venue is proper under 28 U.S.C. § 1402(b) because a substantial part of the acts and/or omissions giving rise to the claims herein occurred in the District of Columbia.  DHS and ICE officials in the District of Columbia were repeatedly on notice of ICE officials' abusive and retaliatory behavior in response to peaceful hunger striking by individuals in detention.  DHS and ICE officials in the District of Columbia were ultimately responsible for promulgating agency guidelines to safeguard against the kind of breaches of confidentiality and violations of policies and regulations that occurred here.  The acts and omissions of District of Columbia-based officials contributed to the abuses Plaintiffs endured.  DHS and ICE officials in the District of Columbia directly oversaw conditions at Pine Prairie, coordinated logistics for the October 13, 2020, removal flight in collaboration with the Department of State, and responded to Congressmembers', journalists', and advocates' inquiries about the removal flight.

19.     Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(A) and (B) and 5 U.S.C. § 703 for claims arising under the APA.

## PARTIES

*Plaintiffs*

20.     Plaintiff JKA[9] is a 22-year-old Cameroonian man who requested asylum in the United States in August 2019 as a result of severe persecution he endured – and would likely continue to endure – by the Cameroonian government.  JKA was incarcerated in ICE facilities under harsh and abusive conditions, and following a summary denial of asylum, he was placed on a mass deportation flight to Cameroon on October 13, 2020.

21.     Plaintiff TBF is a 29-year-old Cameroonian man who requested asylum in the U.S. in August 2019 as a result of severe persecution he endured – and would likely continue to endure – by the Cameroonian government.   TBF was incarcerated in ICE facilities under abusive conditions and endured medical neglect.  TBF suffers from severe asthma.  He was diagnosed with asthma at eight-years-old and requires consistent access to his inhaler, which he is required to use three times a day.  Following a summary denial of asylum, he was placed on a mass deportation flight to Cameroon on October 13, 2020.  On September 9, 2020, TBF's father, who had been granted asylum, filed an I-730 petition on his behalf to recognize TBF as a derivative asylee.  The petition is pending.

*Defendants*

22.     Defendant United States of America is an appropriate defendant under the FTCA, 28 U.S.C. §§ 1346(b), 2671, *et seq*.

---

[9]     Plaintiffs are living in hiding in fear of being arrested and tortured by Cameroonian authorities. The Court has permitted Plaintiffs to proceed pseudonymously to protect their identities.

23.     Defendant U.S. Department of Homeland Security ("DHS") is an executive department of the United States Government headquartered in Washington, D.C.  DHS is the parent agency of ICE.

24.     Defendant Alejandro Mayorkas is the Secretary of DHS.  In this capacity, Mayorkas is ultimately responsible for the actions of ICE.  He is the legal custodian of all people detained in immigration detention facilities.  Defendant Mayorkas is sued in his official capacity.

25.     Defendant ICE is a component agency of DHS and is responsible for enforcing federal immigration law, including the detention and removal of immigrants.  ICE discharges its responsibility for incarceration of immigrants by promulgating detention standards, such as the 2011 Performance-Based National Detention Standards ("PBNDS") as revised in December 2016,[10] to be followed in the facilities in which immigrants are held pending removal proceedings and removal.

26.     Defendant Patrick Lechleitner is the Acting Director of ICE.  In this capacity, Lechleitner is responsible for ICE's policies and practices regarding immigration detention and oversight of the immigration detention system.  Defendant Lechleitner is sued in his official capacity.

## STATEMENT OF FACTS

### I.    Background

27.     Plaintiffs are asylum seekers from Cameroon who were both detained by ICE for approximately 14 months from August 2019 through October 2020 at the Pine Prairie ICE Processing Center in Pine Prairie, Louisiana ("Pine Prairie"). Pine Prairie officers subjected

---

[10]      *See* ICE Performance-Based National Detention Standards 2011, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

Plaintiffs to various forms of abuse including the unlawful use of physical force and retaliatory solitary confinement. They were then transferred to the LaSalle Detention Center in Jena, Louisiana, the Alexandria Staging Facility in Alexandria, Louisiana ("Alexandria") and the Prairieland Detention Center in Alvarado, Texas ("Prairieland").

28.     Both JKA and TBF were then forcibly deported to Cameroon on October 13, 2020, from the Fort Worth Alliance Airport.

29.     ICE has a contract with the Geo Group, Inc., a private prison company, to operate Pine Prairie.  The contract mandates compliance with ICE's 2011 Performance-Based National Detention Standards ("PBNDS") as revised in December 2016.[11] The PBNDS are binding and enforceable against ICE.

30.     The PBNDS establishes mandatory, non-discretionary policies and practices related to the use of force, the use of solitary confinement, the provision of medical care, and other practices that facilities and operators of facilities must follow.  ICE is responsible for ensuring that the requirements of the PBNDS are followed at immigration detention facilities by ICE employees and by ICE contractors.

31.     ICE and DHS also violated their own regulations and provisions of section 208 of the Immigration and Nationality Act ("INA") by failing to protect Plaintiffs' confidentiality during the deportation process. 8 C.F.R. § 208.6(b).

---

[11]     *See* ICE Performance-Based National Detention Standards 2011, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

II.    <u>**Plaintiffs' Mistreatment in Immigration Detention**</u>

A. **Defendants Used Force and Solitary Confinement Against Plaintiffs after They Participated in a Peaceful Hunger Strike at Pine Prairie.**

32.    In August 2020, Plaintiffs were part of a group of approximately 45 Black, majority Cameroonian, detained individuals at Pine Prairie who refused to eat their provided meals in order to declare the renewal of a peaceful hunger strike that began in March 2020.  Plaintiffs and the other hunger strikers protested their indefinite detention; racist treatment and conditions of confinement; blanket parole denials, particularly of the applications of Black detained people; across-the-board failure of ICE to respond to *pro se* parole applications; false and misleading statements by ICE regarding the sincerity of the custody review process; and the inhumanity of being detained during the global COVID-19 pandemic.

33.    On or about August 10, 2020, Plaintiffs and the other protestors had been hunger striking for approximately eight days when officers entered the unit, Charlie-Alpha, where JKA, TBF, and others were detained and stated that Plaintiffs and the other protestors would be removed to the "Echo" unit, which is comprised of solitary confinement cells.  The Echo unit is classified as a "Special Management Unit" under the PBNDS.

34.    As the officers entered the unit with riot gear, Plaintiffs and other protestors sat and laid on the floor, holding their hands up in the air to signify their peaceful intentions. Approximately fifteen officers entered the unit with pepper spray and handcuffs.

35.    Without any provocation from the protestors and with the intent to punish them for their hunger strike and force them into solitary confinement, the officers physically attacked the detained individuals. Plaintiffs witnessed the officers restrain three protestors by climbing on top of them and placing them in chokeholds. They also witnessed officers beat and pepper spray

protestors and saw an officer point a gun at one protestor.  JKA and TBF feared for their lives and witnessing this abuse caused them significant emotional distress.

36.     JKA and TBF were victims of abuse on August 10, 2020.  While JKA and TBF were on the floor with their hands raised, officers pepper sprayed them in the face.  The officers did not provide any warning or verbal commands before using the pepper spray.  After they were pepper sprayed, the officers used force to pin JKA and TBF to the floor and roughly handcuffed their arms behind their backs.  The officers then forcibly dragged JKA and TBF to Echo, the solitary confinement unit.

**B. Defendants Denied Plaintiffs Access to Medical Care While in Solitary Confinement.**

37.     In Echo, JKA was placed in a solitary confinement cell with another Black migrant. After the officer pepper sprayed him, JKA's skin was "on fire."  His clothes were saturated by the pepper spray.  His eyes were burning intensely, and he was temporarily blinded.  JKA was not permitted access to an eye wash to rinse his eyes or face and was not provided with any medical treatment following this attack.  JKA continued to experience painful burning of his skin and eyes for one week after this attack.

38.     In Echo, TBF was placed in a solitary confinement cell alone.  TBF was not permitted access to an eye wash to rinse his eyes or face and was not provided with any medical treatment following this attack.  He desperately tried to rinse his eyes and skin using the toilet-sink in the solitary confinement cell but was unable to clear the pepper spray from his lungs, skin, and eyes, further exacerbating his pain.  As a result, TBF had a severe asthmatic reaction to the pepper spray.  His eyes were swollen, and he was temporarily blinded.  He also experienced severe chest pain and had difficulty breathing.

-11-

39.     After taking TBF to Echo, the officers did not permit TBF access to his inhaler or asthma medication.  In the solitary confinement cell, TBF had an asthma attack, triggered by the pepper spray, and feared for his life.  The officials at Pine Prairie denied his multiple requests for access to his inhaler and medical treatment.  TBF was not provided with access to his inhaler for four days—until August 14, 2020.

40.     Plaintiffs were both isolated in solitary confinement cells in Echo for approximately seven consecutive days.  During this seven-day period, Plaintiffs were confined to their cells for approximately 24-hours a day and did not have access to any recreational or outdoor time.  They were also denied access to the phone and a tablet that enabled them to contact legal counsel, journalists, and family members.  Even though their clothes and bodies were saturated in pepper spray, they were not permitted access to the shower or clean clothing for three days.

41.     Plaintiffs were not provided with drinking water and only had access to the toilet-sink in the solitary confinement cells.  They were also denied access to medical care to treat the burns on their skin and bodies from the pepper spray and the injuries to their eyes.  They were also not provided with any medical examinations during this time to assess the impact of the hunger strikes on their health.

42.     Plaintiffs' mistreatment followed a pattern of similar abuse after use of force incidents in Pine Prairie. The year prior, from August 27-29, 2019, the ICE Office of Detention Oversight conducted a three-day compliance inspection at Pine Prairie. That inspection revealed deficiencies in Pine Prairie's provision of medical assessment and care following use of force incidents.[12]

---

[12]     Dep't of Homeland Sec., Immigr. and Customs Enf., Office of Detention Oversight, *Compliance Inspection for the Pine Prairie ICE Processing Center* 9-10 (Aug. 27-29, 2019), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2019-PinePrairieICEPC.pdf.

**C. Defendants Again Used Unjustified Physical Force in Retaliation Against Plaintiffs for Resuming the Hunger Strike.**

43.    After finally being released from solitary confinement, Plaintiffs and the others resumed their hunger strike on or around August 21, 2020.  On August 24, 2020, JKA and TBF were in the housing unit when officers in full military riot gear entered the unit.  They threatened the group that if they continued to participate in the hunger strike, they would be taken back to the solitary confinement unit.

44.    The officers used handcuffs and pepper spray to deploy force to detain Plaintiffs and the other hunger strikers.

45.    An officer pepper sprayed JKA in the face and roughly pushed him to the ground and handcuffed him.  JKA was forcibly taken to Echo and placed in a solitary confinement cell with one other individual.

46.    An officer used force to push TBF to the ground and restrained him, handcuffing his hands behind his back.  The officer then forcibly took him to Echo.

47.    At this time, Pine Prairie was using the Echo unit to quarantine detained individuals who had been exposed to or infected by COVID-19.[13]  Plaintiffs and others witnessed officers take the quarantined individuals out of the Echo solitary confinement cells before their 14-day quarantine period had expired.  Officers then forced Plaintiffs and the other hunger strikers into the same cells without cleaning or sanitizing them, even though Plaintiff TBF suffered from asthma, increasing his risk of severe health complications from COVID-19.

---

[13]    *See* Rosemary Westwood, *'They Don't Care About Anything': Inside A COVID-19 Outbreak At One Louisiana ICE Facility*, WWNO, New Orleans Public Radio (August 12, 2020), https://www.wwno.org/latest-news/2020-08-12/they-dont-care-about-anything-inside-a-covid-19-outbreak-at-one-louisiana-ice-facility.

48.     Approximately three days after officers placed him in the contaminated cell, JKA began to develop COVID-19 symptoms including a severe cough and a fever. He was not provided with access to a COVID-19 test and did not receive any medical treatment during this time.

49.     After approximately four days, TBF began to develop COVID-19 symptoms including a fever, a cough, chest pain, and difficulty breathing. Because of his severe asthma, he was particularly vulnerable to COVID-19. He was tested for COVID-19 but never received the result of this test. TBF feared for his life during this time.

50.     Plaintiffs were held in solitary confinement cells in Echo for four consecutive days between August 24 and August 28, 2020. Again, even though JKA's clothes and body were saturated in pepper spray, he was not permitted access to the shower or clean clothing for these four days. During the four-day period, Plaintiffs were confined to their cells for 24 hours a day and did not have access to any recreational or outdoor time. They were also denied access to the phone and tablet that was the only way to communicate with legal counsel and family members.

51.     Plaintiffs were not provided with drinking water and only had access to the toilet-sink in the solitary confinement cells. JKA was also denied access to medical care to treat the burns on his skin and body from the pepper spray. Even though Plaintiffs were actively engaging in a hunger strike, they were not provided with any medical examinations during this time.

52.     During this time, an officer told TBF that "if you don't eat food, you get no water." TBF was also denied access to medical treatment for his asthma and was only provided with sleeping pills.

**D.  DHS and ICE Officials Disregarded Agency Policies and Violated Plaintiffs' Rights.**

53.    After the August 2020 hunger strikes, Plaintiffs and the other hunger strikers notified ICE officials about their cases and conditions of confinement and made repeated requests to speak with ICE officials.

54.    While Plaintiffs were in Echo, ICE officials met with individuals to negotiate a review of their pending parole applications in exchange for an end to the mass hunger strike. Following representations by ICE officials that they would review pending parole cases of the protestors, JKA, TBF and the others agreed to a temporary pause of their hunger strike.  Plaintiffs were then released from the punitive unit and moved into separate housing units to suppress their protest.

55.    However, upon information and belief, ICE failed to review the pending parole applications and the negotiations failed.

56.    These attacks on Plaintiffs were unlawful and unjustified, as recognized by ICE's own policies on the use of force.  ICE's Use of Force Policy (the "Force Policy"), issued as part of the PBNDS, states that immediate use of force is only permitted when "a detainee's behavior constitutes a serious and immediate threat to self, staff, another detainee, property, or the security and orderly operation of the facility."[14]  Plaintiffs had not displayed any behavior that constituted a threat to themselves or the officers.  Plaintiffs were exercising their legal right to participate in a hunger strike, a First Amendment protected activity, and the officers' physical assault was unprovoked and against the Force Policy.

---

[14]    U.S. Immigration and Customs Enforcement, *2.15 Use of Force and Restraints*, Performance-Based National Detention Standards, 206 (Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

57.     Pepper spray is an authorized "immediate force device" under the Force Policy. However, the use of non-lethal weapons on detained people is only authorized by the Force Policy in situations in which a detained person is armed and barricaded or cannot be approached without danger to the ICE agent or detained person *and* "a delay in controlling the situation would seriously endanger the detainee or others, or would result in a major disturbance or serious property damage."[15]  None of those conditions were met in this case, making the use of pepper spray unauthorized by the Force Policy.

58.     Furthermore, the Force Policy states that "Staff shall consult medical staff before using oleoresin capsicum ("OC") spray [also known as pepper spray] or other non-lethal weapon(s) unless escalating tension make such action unavoidable.  When possible, medical staff will review the detainee's medical file for any disease or condition that a non-lethal weapon could seriously exacerbate, including, but not limited to, asthma, emphysema, bronchitis, tuberculosis, obstructive pulmonary disease, angina pectoris, cardiac myopathy, or congestive heart failure."[16]  Upon information and belief, officers did not consult medical staff before deploying pepper spray against JKA and TBF, who suffers from asthma.

59.     People exposed to pepper spray should remove contaminated clothing as quickly as possible, wash their body with water and soap, and seek medical care immediately.[17]  After deploying pepper spray against Plaintiffs and others in circumstances not authorized by the Force Policy, ICE compounded this improper conduct by denying JKA and TBF access to critical

---

[15]    *Id.* at 205.
[16]    *Id.*
[17]    *Facts About Riot Control Agents Interim Document*, Centers for Disease Control and Prevention (Apr. 4, 2018), https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp; M.F. Yeung et al., *Clinicopathological effects of pepper (oleoresin capsicum) spray*, 21 Hong Kong Med. J. 542, 547-48 (Dec. 2015), https://www.hkmj.org/system/files/hkmj154691.pdf.

-16-

medical care and basic human necessities such as soap and water, which would have mitigated the effects of the pepper spray, for over three days.  As a result of ICE's use of pepper spray, JKA and TBF suffered serious physical injury as well as lasting psychological harm.

60.     The Force Policy explicitly prohibits the use of force to punish a detained person.[18] The officers' attacks on Plaintiffs in August 2020 were intended to punish Plaintiffs for their participation in the mass hunger strike. The use of force against Plaintiffs because of their participation in the hunger strike violates the Force Policy. The Force Policy also prohibits using force against a detained person offering no resistance. The use of force against a detained person offering no resistance is a battery. As a consequence of this battery, Plaintiffs experienced significant physical pain and emotional distress.

61.     The Force Policy requires an examination of a detained person immediately following any use of force incident to assess any medical needs and document any injuries sustained.  No medical examination was given to Plaintiffs following the use of force against them on either occasion, nor was any report made related to the injuries they sustained.

62.     ICE's use of solitary confinement in response to Plaintiffs' participation in the hunger strike was punitive in nature.  ICE administers several types of solitary confinement,

---

[18]     Force Policy at 202.

including (1) disciplinary segregation [19] and (2) administrative segregation. [20]  The Special Management Unit Policy (the "SMU Policy"), issued as part of the PBNDS, governs ICE's use of solitary confinement.  The SMU Policy prohibits the use of punitive solitary confinement except where a detained person has been found at a disciplinary hearing to have committed a serious violation of a facility rule.[21]

63.    Plaintiffs did not violate any facility rules and were not involved in any disciplinary hearing.  Upon information and belief, ICE did not conduct a disciplinary hearing or obtain an order of a facility disciplinary hearing authorizing Plaintiffs' placement in solitary confinement, in contravention of the SMU Policy.

64.    Under PBNDS Standard 4.2 (Hunger Strikes), detained individuals participating in hunger strikes may be "isolated for close supervision," and in the event of such isolation, "medical personnel shall monitor the detainee in a single-occupancy observation room, when medically

---

[19]    *See* ICE Directive No. 11065.1, Review of the Use of Segregation for ICE Detainees (2013), 3.2, https://www.ice.gov/doclib/detention-reform/pdf/segregation_directive.pdf. ("Disciplinary segregation is a punitive form of separation from the general population for disciplinary reasons. Disciplinary segregation is authorized only pursuant to the order of a facility disciplinary panel, following a hearing in which the detainee is determined to have committed serious misconduct in violation of a facility rule, and only consistent with the Disciplinary Severity Scale from the applicable ICE detention standards, and only when alternative dispositions would inadequately regulate detainee behavior.").

[20]    *See* ICE Directive No. 11065.1, Review of the Use of Segregation for ICE Detainees (2013), 3.1, https://www.ice.gov/doclib/detention-reform/pdf/segregation_directive.pdf. ("Administrative segregation is a non-punitive form of separation from the general population for administrative reasons. Administrative segregation is authorized only as necessary to ensure the safety of the detainee, facility staff, and other detainees; the protection of property; or the security or good order of the facility, and therefore should be for the briefest term and under the least restrictive conditions practicable, consistent with the rationale for placement. Generally, detainees in administrative segregation shall receive the same privileges as detainees housed in the general population, consistent with safety and security concerns.").

[21]    *See* U.S. Immigration and Customs Enforcement, *2.12 Special Management Units*, Performance-Based National Detention Standards, 177 (Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

advisable and taking into consideration the detainee's mental health needs." Plaintiffs did not undergo any such medical observation.

65.     The PBNDS Medical Care standards provide that CDC "guidelines for the prevention and control of infectious and communicable diseases shall be followed." The PBNDS also provide that "[f]acilities shall comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues."

66.     In April 2020, ICE established COVID-19 specific Pandemic Response Requirements ("PRR"), which set forth mandatory requirements related to the management of COVID-19 at immigration detention facilities. At the time of Plaintiffs' exposure to COVID-19, the PRR Version 3.0 was in effect.[22] The PRR 3.0 required a list of measures be implemented at ICE detention facilities related to COVID-19 testing, isolation, prevention, and treatment.

67.     The PRR 3.0 require that in quarantining individuals who have contracted or have been exposed to COVID-19, ICE facilities "maintain isolation until all the CDC criteria have been met. The decision to discontinue Transmission-Based Precautions should be made using a test-based strategy, a symptom-based strategy, or a time-based strategy."[23]

68.     The PRR 3.0 also provide that facilities must "adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response."

---

[22]     ERO COVID-19 Pandemic Response Requirements (Version 3.0, July 28, 2020), https://www.ice.gov/coronavirus.
[23]     PRR Version 3.0 (citing Centers for Disease Control and Prevention, Discontinuation of Transmission-Based Precautions and Disposition of Patients with COVID-19 in Healthcare Settings (Interim Guidance), https://www.cdc.gov/coronavirus/2019ncov/hcp/disposition-hospitalized-patients.html (last visited July 19, 2020)).

69.    ICE officials did not follow these procedures when they placed Plaintiffs in cells reserved for detained individuals who tested positive for COVID-19, leading to both JKA and TBF becoming sick.

**E.  Oversight Entities Including DHS CRCL and ICE OIDO Have Documented Abuses at Pine Prairie.**

70.    On January 31, 2020, the DHS Office for Civil Rights and Civil Liberties ("CRCL") sent a memorandum to ICE's Acting Director and the Executive Principal Legal Advisor, Office of the Principal Legal Advisor, regarding numerous complaints that CRCL had received about abuses at Pine Prairie Detention Center.[24]   The complaints involved allegations related to violations of due process rights, national origin discrimination, prolonged segregation, physical, verbal and mental abuse, denial of legal access, and quarantine and exposure to airborne illnesses resulting in denial of recreation.  The memorandum informed ICE that CRCL would be conducting an onsite investigation of Pine Prairie.

71.    On February 18-20, 2020, CRCL conducted its onsite investigation of Pine Prairie, using four independent subject matter experts: a medical consultant, mental health consultant, environmental health and safety consultant, and a penologist.[25]  Based on interviews with detained

---

[24]    Memorandum from Cameron P. Quinn, Officer, Office for Civil Rights and Civil Liberties, to Matthew T. Albence, Acting Director, U.S. Immigration and Customs Enforcement, and Michael P. Davis, Executive Deputy Principal Legal Advisor, Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement, *Pine Prairie Detention Center* (January 21, 2020), https://www.dhs.gov/sites/default/files/publications/pine-prairie-detention-center-01-31-20.pdf.

[25]    Memorandum to Enrique M. Lucero, Executive Associate Director, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement, from Peter E. Mina, Deputy Officer for Programs and Compliance, Office for Civil Rights and Civil Liberties, and Dana Salvano-Dunn, Director, Compliance Branch, Office for Civil Rights and Civil Liberties, *Pine Prairie Detention Center* (August 12, 2020), https://www.dhs.gov/sites/default/files/2022-06/2020.08.12%20CRCL%20Rec%20Memo%20to%20ICE%20–%20Pine%20Prairie_Redacted_508.pdf.

people and staff, document reviews, and onsite observations, the experts identified numerous deficiencies at Pine Prairie, including in medical and mental health care. On August 12, 2020, after completing its investigation of Pine Prairie, CRCL issued a memorandum to the Executive Associate Director of ICE Enforcement and Removal Operations.[26] The memorandum addresses deficiencies in areas including, but not limited to, sick calls, medications, confidentiality of medical records, specialty care, calculated use of force, suicide prevention, the disciplinary process, and environmental health and safety.

72.    On September 20, 2023, the ICE Office of the Immigration Detention Ombudsman ("OIDO") issued a report finding 17 violations of the PBNDS at Pine Prairie.[27] Those violations included, "documentation of medical clearances for detainees in segregation," "documentation of medication doses," "medical credentialing," "timely response to detainee communications," and "detainee privacy."

73.    Relevant to officers denying TBF access to his inhaler in solitary confinement, OIDO found: "The 2011 PBNDS section 4.3 on medical care requires that detainees in SMUs have access to the same or equivalent health care services as detainees in the general population. Specifically, health care personnel shall be immediately informed when a detainee is admitted to SMU and shall conduct an assessment and review of the detainee's medical and mental health status and care needs. Health care personnel shall at a minimum conduct a daily assessment of detainees in an SMU . . . Inadequate medical documentation of SMU cases increases the possibility

---

[26]    *Id.*
[27]    Office of the Immigr. Detention Ombudsman, *OIDO Inspection: Pine Prairie ICE Processing Center* (Sept. 20, 2023), https://www.dhs.gov/sites/default/files/2024-01/23_0920_OIDO_Final-Inspection-Report-Pine-Prairie-ICE-Processing-Center_0.pdf

that detainees could be placed in a detention setting that is detrimental to their medical and mental health wellbeing."[28]

**F. DHS and ICE Engaged in Deceptive and Unlawful Practices in the Transfer of Plaintiffs for Deportation.**

74. Around the beginning of September 2020, Defendants transferred Plaintiffs and other Black asylum seekers out of Pine Prairie in an effort to repress their hunger strike. Plaintiffs were transferred to LaSalle Detention Center in Jena, Louisiana (currently known as the Central Louisiana ICE Processing Center).

75. After being transferred to LaSalle Detention Center, JKA and TBF were told by an ICE officer that they were being transferred again because they were going to have an opportunity to have a second Credible Fear Interview. This was both false and intended to mislead and deceive JKA and TBF.

76. ICE officers threatened TBK and presented him a travel document with a forged signature. TBK told the officer that the signature on the document was not his, but they did not listen to his plea.

77. Officials put JKA and TBF on a bus with others to be transported to Alexandria but did not tell them that they were being deported. When Plaintiffs arrived in Alexandria, they were told that they were going to be moved to Prairieland in Texas. JKA understood then that they were being deported.

78. When ICE officials came, JKA and the others started crying because they were terrified of being deported back to Cameroon. ICE officials responded by handcuffing JKA and putting chains around his hands, legs, and waist.

---

[28] *Id.* at 7-8.

**G. ICE Denied Plaintiffs Access to Their Baggage, Which Contained Information and Documents Related to Their Asylum Claims.**

79.     For the first two days at Prairieland, Plaintiffs and the other individuals detained with them were allowed to make phone calls, but after two days, their access to phones was cut off.

80.     At Prairieland, JKA and TBF both asked an officer for access to their bags.  JKA and TBF explained that they had documents related to their asylum applications and the CFI process in their luggage.  They pleaded with the officer, but the officer again denied their requests.  JKA, TBF, and other Cameroonians at Prairieland began to protest this denial of access to their luggage and the officers brought out a small number of bags.

81.     JKA was terrified that the Cameroonian authorities would kill him if they found his Southern Cameroons National Council ("SCNC") card and asylum documents.  Despite repeated requests, JKA was never able to access his baggage while at Prairieland.  On one occasion, he asked a uniformed ICE officer if he could access his bag to remove the sensitive documents, but the officer denied access to his luggage.

82.     JKA's baggage contained his asylum case file with reports from Cameroon, his credible fear interview, his declaration, photographs he had for evidence in his case, his wallet, and his SCNC party card.

83.     TBF's baggage contained his credible fear interview, his immigration judge decision, country conditions documents, and evidence of his persecution by the Cameroonian government. TBF experienced significant emotional distress and feared that if these documents were discovered by the Cameroonian authorities, he would be detained and killed by the Cameroonian government.

84.     Plaintiffs and the other individuals who were detained repeatedly asked for their bags to remove any identifying documents, but facility guards told them that ICE gave the officers instructions not to give them access to their bags.

85.     Deportation after denial of access to baggage violates the PBNDS, which governed the Prairieland Detention Center at the time of Plaintiffs' removal. PBNDS Standard 7.4 states that "[d]uring transport, a detainee shall ordinary have . . . in his or her possession . . . [a]ll legal material."[29] Denial of access to a bag to remove legal material prevents people from having that material in their possession.

86.     Similarly, PBNDS Standard 1.3 requires DHS to verify, before transport, that each individual "has in his/her possession all funds, valuables, and other personal property listed on the property inventory form."[30]

87.     Additionally, PBNDS Standard 2.5 provides that "property shall be returned to the detainee" prior to release or transfer.[31] Standard 2.5 also lists legal documents as personal property that detainees are allowed access to at various times during their detention.[32]

88.     Furthermore, Defendants DHS and ICE are bound to the confidentiality protections for individuals in asylum-related proceedings. 8 C.F.R. § 208.6(b) requires ICE and other government agencies to preserve the confidentiality of asylum application materials.  ICE officers understood or should have foreseen that, if these asylum documents were not removed, they would be seized by government officials in Cameroon and could place Plaintiffs in danger of persecution.

---

[29]     U.S. Immigration and Customs Enforcement, *7.4 Detainee Transfers*, Performance-Based National Detention Standards, 461 (Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.
[30]     *Id.* at *1.3 Transportation (by Land)*, 41.
[31]     *Id.* at *2.5 Funds and Personal Property)*, 97.
[32]     *Id.* at 92.

89.     Yet JKA and TBF were transferred to Fort Worth Alliance Airport for deportation without being granted access to remove documents related to their asylum applications from their baggage.

**H. Plaintiffs, Despite Widespread Protests from Advocates and Community Members, Were Deported to Cameroon on October 13, 2020.**

90.     On August 26, 2020, four human rights groups filed a Civil Rights Complaint with CRCL and the DHS Office of Inspector General ("OIG"), calling on the agency to halt and investigate "the use of force and solitary confinement" against Black asylum seekers, among whom were JKA and TBF, who participated in the hunger strike at Pine Prairie.[33]

91.     The complaint reported that ICE officers misrepresented parole and immigration law standards to the protestors and noted that they had been trained to "deport as many of you as possible."[34]

92.     Also in the fall of 2020, human rights groups made reports to ICE, CRCL, and OIG about ICE and facility officers' racism and use of violence, restraints, and pepper spray against

---

[33]     Southern Poverty Law Center, *Call for an Immediate Halt to and Investigation of Detention, Violence, Repression and Racism Against Peacefully Protesting Cameroonian and Black Asylum Seekers, and other Asylum Seekers, at Pine Prairie ICE Processing Center; and the release of all Black Hunger Strikers from Solitary Confinement* (August 26, 2020), https://www.splcenter.org/sites/default/files/8.26.20_crcl_letter.pdf.

[34]     *Id.* at 4.

Black asylum seekers at Adams County Correctional Center[35] and Jackson Parish Correctional Center.[36]

93.    Many of the Cameroonian individuals who suffered the harm detailed in these three separate complaints and participated in the complaints against ICE and DHS were the same individuals scheduled for deportation on the flight on October 13, 2020.

94.    Members of the U.S. Congress also became involved in trying to stop the deportation flights because of the humanitarian crisis in Cameroon. Representative Bennie Thompson, Chairman of the House Committee on Homeland Security, and Representative Karen Bass, Chairwoman of the Congressional Black Caucus, sent a letter to ICE on October 13, 2020, urging ICE to stop the October 13 deportation flight.[37] The letter cites the complaint detailing abuse and concerns with illegitimate travel documents reported by the Cameroonians detained at Adams County and urged ICE to halt the removal of the 200 Cameroonians slated for removal until an investigation into the troubling complaint allegations was complete.

95.    Representatives Ilhan Omar, Cedric Richmond, and Joaquin Castro also sent a letter on October 13 raising concerns both about the treatment of Cameroonians in detention and the

---

[35]    Freedom for Immigrants et al, *Immigration and Customs Enforcement Officers' Use of Torture to Coerce Immigrants Into Signing Immigration Documents at Adams County Correctional Facility* (Oct. 7, 2020), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5f7f17f39e044f47175204fb/1602164723244/Re+CRCL+Complaint+ICE%27s+Use+of+Torture+to+Coerce+Immigrants+to+Sign+Immigration+Documents+at+Adams+County+Correctional+Facility.pdf.

[36]    Freedom for Immigrants et al., *U.S. Immigration and Customs Enforcement (ICE)'s Pattern of Torture in Signing of Deportation Documents for Cameroonian Migrants* (Nov. 5, 2020), https://www.splcenter.org/sites/default/files/crcl_complaint_ice_s_pattern_of_torture_in_signing_of_deportation_documents_for_cameroonian_migrants.pdf.

[37]    Congressional Black Caucus Letter to ICE (Oct. 13, 2020), https://cbc.house.gov/uploadedfiles/2020-10-13_t_dhs_ice_-_cameroonian_asylum_seekers.pdf.

danger they would face after deportation in Cameroon, and asked ICE to respond to a set of questions about ICE's treatment of Cameroonian migrants.[38]

96.     Despite being aware of these violations, DHS and ICE persisted in deporting Plaintiffs on October 13, 2020.

97.     ICE officials in Washington, D.C. planned and coordinated the October 13, 2020 flight, including by arranging for photo and video documentation of the flight and coordinating flight logistics.

98.     ICE officials in Washington, D.C. communicated with State Department officials about the October 13, 2020 flight in advance of and after the flight.

99.     ICE public affairs officials in Washington, D.C. received and responded to press inquiries regarding the October 13, 2020 removal flight in advance of the flight, the day of the flight, and following the flight.

100.     ICE public affairs officials in Washington, D.C. monitored press coverage and social media communications from advocacy groups in the lead up to and during the October 13, 2020 removal flight.

101.     ICE designated the October 13, 2020, flight as a "Special High Risk Charter" flight. According to the ICE Air Handbook, such flights are "to remove Failure to Comply (FTC) and significant High-Profile Removals (HPRs) from the United States." This designation placed a SWAT team of officers on the deportation flights.[39]

---

[38]     Congressional Letter to ICE (Oct. 13, 2020), https://omar.house.gov/media/press-releases/reps-omar-richmond-castro-lead-letter-condemn-treatment-cameroonian-migrants
[39]     *See infra* II.E.i; DHS ICE Budget Overview, FY 2020 Congressional Justification at 134, https://www.dhs.gov/sites/default/files/publications/19_0318_MGMT_CBJ-Immigration-Customs-Enforcement_0.pdf.

102.    On October 13, 2020, Plaintiffs were restrained and forced onto a plane even though they expressed fears about facing harm if they were returned to Cameroon.

103.    For the approximately 16-hour flight back to Cameroon, Plaintiffs remained shackled in the five-point restraints[40] they were placed in at the Fort Worth airport.  They were handcuffed with chains around their waist and legs, making it impossible to move.  As a result of ICE's negligent use of five-point restraints, Plaintiffs experienced and continue to experience significant physical and psychological harm.

104.    Since they were shackled in place for the duration of the flight, Plaintiffs were unable to eat the bread and bottled water that they were provided.  ICE refused to remove the restraints to allow Plaintiffs to eat.  ICE also denied Plaintiffs and others access to the restroom on the airplane for the duration of the 16-hour flight.  Plaintiffs witnessed other people ask ICE officers to use the restroom, only to be denied.  Many of these people were forced to soil themselves in their seats.

105.    During the flight, JKA experienced excruciating pain because the handcuffs and chains of the five-point restraints were so tight that they cut off the circulation to his wrists and ankles.  He was left with deep cuts and bruises on his wrists and ankles from the chains and he experienced severe pain for several days after his deportation.

106.    TBF was restrained during the flight and experienced pain in his legs and wrists. The chains made cuts and bruises on his body.  TBF also did not have his inhaler during the flight. He told the ICE officers on the plane about his medical need, and they ignored him.  He had difficulty breathing and chest pains during the flight.  He requested medical assistance during the

---

[40]    Herein, the term "five-point restraints" refers to handcuffs and leg irons connected to a waist chain.

flight and told the officers he was having difficulty breathing but again no one helped him.    TBF experienced severe emotional distress because of this denial of medical treatment.

   **I.  Upon Their Arrival in Cameroon, Plaintiffs Were Detained and Questioned by Cameroonian Authorities and Currently Live in Hiding in Cameroon and Fear for Their Lives.**

   107.    When they arrived in Douala, Cameroon, JKA and TBF witnessed Cameroonian authorities searching bags.

   108.    When JKA arrived in Cameroon, he was given a plastic bag with the shoes he had worn coming to the United States.  JKA witnessed ICE officials hand over his ID and belongings to Cameroonian authorities.  He was detained at the airport and interrogated by the Cameroonian military police.  Officials asked him questions about where he was coming from and why he was sent back to Cameroon.  The officials also told him that they knew information about him.

   109.    JKA was then taken outside and placed in a military car with other deported individuals.  They were transported to a house surrounded by military officials with guns.  He was kept in the house for a week.  Everyone detained was a member of the SCNC.  The guards at the house repeatedly called JKA and the other individuals "traitors."  Military guards were posted outside the house and the doors were locked most of the time except for when people came to bring food.

   110.    One afternoon, JKA helped the people carrying food and supplies.  He went outside pretending to be one of the individuals bringing supplies and once outside, fled from the house. He ran as fast as he could until he came across a person with a phone.  He called for help and was picked up by his aunt's friend several hours later.  JKA has been in hiding ever since he escaped. He attempts to sell food at a street stand to earn money to survive but lives in fear of being found.

111.    TBF was held by airport officers and police.  He was detained in a small, confined room for two to three hours.  He was then taken to "quarantine" in Yassa, Cameroon where he was detained for the night.  TBF's older sister came to Yassa and paid a bribe to secure his release.

112.    Since escaping the Cameroonian military, TBF has lived in hiding in Cameroon and fears for his life and safety.  The Cameroonian government issued a warrant for his arrest on September 2, 2019.  Most days, he is unable to leave his house.

113.    The Cameroonian military came to his sister's house and threatened her for information about TBF after he was deported to Cameroon.  They showed his sister a warrant for his arrest with his picture.  This has caused TBF to fear for his family's safety and has prevented him from returning to his hometown.

114.    TBF believes the warrant was issued because of the documents related to his asylum claim in his luggage.  TBF does not have a national ID card in Cameroon and is unable to move within the country safely.  TBF also does not have a passport and is unable to leave Cameroon.

115.    In Cameroon, TBF continues to struggle with anxiety and depression from what has happened.  He is terrified of being caught by Cameroonian authorities and has avoided going to the hospital and getting medical care out of fear of being found.  Because of his inability to move safely and freely, TBF struggles to afford and secure medication, including inhalers, and suffers severe health consequences related to his asthma.

## **CLAIMS FOR RELIEF**

### **COUNT I: ABUSE OF PROCESS**
### **(Against Defendant United States)**

116.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

117.    Under Louisiana and District of Columbia law, abuse of process occurs when an individual has an ulterior purpose and takes a willful action to use legal process in a manner that is not proper in the regular conduct of the proceeding.

118.    The federal employees, officials, and agents referenced above abused legal processes within their control for the unlawful purposes of traumatizing Plaintiffs JKA and TBK to abandon their lawful asylum, Convention Against Torture ("CAT"), parole, and custody review claims and deterring future Cameroonian migrants from seeking refuge in the United States.

119.    Plaintiffs JKA and TBK were injured by Defendant's misconduct, including but not limited to Defendant's agents using unlawful force, withholding treatment and basic necessities, and weaponizing solitary confinement against Plaintiffs JKA and TBK.

120.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs JKA and TBK for abuse of process.

## COUNT II: NEGLIGENT SUPERVISION
### (Against Defendant United States)

121.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

122.    Under Louisiana and D.C. law, negligent supervision occurs when the defendant is negligent by breaching a duty of care owed to the plaintiff that proximately results in injury.

123.    Plaintiffs suffered damages from the foreseeable misconduct of federal employees and agents supervised by the Defendant.  The government's employees in supervisory roles have a duty to properly supervise detention officers and to oversee their treatment of immigrants in their custody.

124.    The blatant disregard for ICE's own internal policies and regulations, described above and demonstrated by Defendants' agents' behavior, including but not limited to:

a.  Failing to care for Plaintiffs JKA and TBK in accordance with the Detention Standards and the Force Policy referenced above;

b.  Failing to provide medical care to Plaintiffs JKA and TBK;

c.  Failing to exercise adequate care in restraining Plaintiffs JKA and TBK, including using pepper spray and force;

d.  Failing to take steps to decontaminate JKA and TBK, provide appropriate medical care, and provide for basic needs like soap and clean clothing, after using pepper spray;

e.  Failing to provide water and basic necessities;

f.  Exposing Plaintiffs JKA and TBF to COVID-19 by failure to follow protocols regarding isolation and cleaning; and

g.  Weaponizing solitary confinement against Plaintiffs JKA and TBK,

shows that ICE and DHS staff were negligent in their non-discretionary duties to supervise individual officers.  The government knew or should have known of these behaviors and nevertheless failed to adequately supervise the individual officers.

125.    The government's negligent supervision proximately caused the unlawful conduct described herein.

126.    As a proximate result of the failure to supervise, Plaintiffs JKA and TBK suffered severe pain, physical injury, and emotional distress.

127.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs JKA and TBK for negligent supervision.

## COUNT III: NEGLIGENCE
### (Against Defendant United States)

128.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

129.    In Louisiana, negligence occurs when: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached the requisite duty of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; and (4) the risk, and harm caused, was within the scope of protection afforded by the duty breached.

130.    The federal employees, officials, and agents referenced above had a duty to Plaintiffs JKA and TBF to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

131.    Additionally, the federal employees, officials, and agents referenced above owed Plaintiffs JKA and TBK a heightened duty of care, including a duty to provide appropriate medical care, because at all times relevant to this complaint, they had custody over Plaintiffs.

By engaging in the negligent and careless acts and/or omissions described in detail above, and including, but not limited to:

a.  Failing to care for Plaintiffs JKA and TBK in accordance with the Detention Standards and the Force Policy referenced above;

b.  Failing to provide medical care to Plaintiffs JKA and TBK;

c.  Failing to exercise adequate care in restraining Plaintiffs JKA and TBK, including using pepper spray and force;

d.  Failing to take steps to decontaminate JKA and TBK, provide appropriate medical care, and provide for basic needs like soap and clean clothing, after using pepper spray;

e.  Failing to provide water and basic necessities;

f.  Placing Plaintiffs in solitary confinement; and

g.  Exposing Plaintiffs JKA and TBF to COVID-19 by failure to follow protocols regarding isolation and cleaning.

132.    The federal employees, officials, and agents referenced above failed to act with ordinary care and breached both their duty of care and heightened custodial duties of care owed to Plaintiffs.

133.    As a direct and proximate result of Defendant's agents' negligent conduct, Plaintiffs JKA and TBK suffered substantial injuries, including but not limited to pain, physical injury, and emotional distress.

134.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence and negligent infliction of emotional distress.

## COUNT IV: BATTERY
### (Against Defendant United States)

135.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

136.    Under Louisiana law, a battery occurs when an individual makes harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such contact.

137.    As detailed above, the federal employees, officials, and agents referenced above intentionally engaged in unlawful and unjustified harmful or offensive contact with Plaintiffs JKA and TBK by engaging in the following acts, which include, but are not limited to:

a.    Using pepper spray and force on Plaintiffs JKA and TBK during their hunger strike;

b.    Failing to take steps to decontaminate JKA and TBK, seek appropriate medical care, and provide for basic needs like soap and clean clothing, after using pepper spray;

c.    Using unnecessary force and unnecessary restraints on Plaintiffs JKA and TBK; and

d.    Intentionally exposing Plaintiffs JKA and TBF to COVID-19 in violation of protocols regarding isolation and cleaning.

138.    As a direct and proximate result of Defendant's agents' harmful or offensive contact, Plaintiffs JKA and TBK suffered the injuries detailed above, including substantial physical injury such as burns on their bodies, injury to their eyes, and TBF's severe asthmatic reaction, chest pain, difficulty breathing, and temporary blindness, as well as lasting emotional distress.

139.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs JKA and TBK for battery.

## COUNT V: ASSAULT
### (Against Defendant United States)

140.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

141.    Under Louisiana law, assault is threat of battery.

142.    As detailed above, the federal employees, officials, and agents referenced above intentionally, knowingly, or recklessly threatened or caused harmful or offensive contact with Plaintiffs JKA and TBK by engaging in the following acts, which include, but are not limited to:

   a.   Using pepper spray on Plaintiffs JKA and TBK and others they believed were participating in the hunger strike;

   b.   Failing to take steps to decontaminate JKA and TBK, seek appropriate medical care, and provide for basic needs like soap and clean clothing, after using pepper spray;

   c.   Using unnecessary force and unnecessary restraints on Plaintiffs JKA and TBK; and

   d.   Intentionally exposing Plaintiffs JKA and TBF to COVID-19 in violation of protocols regarding isolation and cleaning.

143.    As a direct and proximate result of Defendant's agents' threat of harmful or offensive contact, Plaintiffs JKA and TBK suffered injuries, including among other things,

substantial physical injury such as burns on their bodies, injury to their eyes, and TBF's severe asthmatic reaction, chest pain, difficulty breathing, and temporary blindness, as well as lasting emotional distress.

144.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs JKA and TBK for assault.

## COUNT VI:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendant United States)

145.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

146.    Under Louisiana and D.C. law, intentional infliction of emotional distress occurs where the defendant intentionally or recklessly engages in extreme and outrageous conduct that caused the plaintiff severe emotional distress.

147.    The federal employees and officers referenced above intentionally or recklessly engaged in extreme and outrageous conduct that inflicted severe emotional distress on Plaintiffs JKA and TBK.

148.    JKA and TBK were subject to verbal and physical abuse, as well as punitive solitary confinement, for the purpose of terrorizing them.

149.    Plaintiffs JKA and TBK each suffered severe emotional distress and mental anguish as a result of this conduct.

## COUNT VII:
### 5 U.S.C. § 702: Violation of the Administrative Procedure Act and *Accardi* Doctrine
### (Against Defendants DHS and ICE)

150.    Pursuant to the *Accardi* doctrine, if an agency fails to follow its own standards, "the APA (as developed by case law) gives aggrieved parties a cause of action to enforce compliance." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).  "Agencies cannot relax or

modify regulations that provide the only safeguard individuals have against unlimited agency discretion." *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003).

151.    Defendants' decision not to comply with or enforce their own standards was a final agency action that caused Plaintiffs injuries in fact. Defendants DHS and ICE's final agency action failed to protect Plaintiffs JKA and TBK's confidentiality by denying them access to their baggage at Prairieland Detention Center in Alvarado, Texas, prior to being transferred to the Fort Worth Alliance Airport for removal to Cameroon – in violation of 8 C.F.R. § 208.6(b) of the INA and Defendants DHS and ICE's own policies.

152.    Defendant DHS and ICE are bound to the confidentiality protections for individuals in asylum-related proceedings.  Per 8 C.F.R. § 208.6(b), "[t]he confidentiality of other records kept by DHS and the Executive Office for Immigration Review that indicate that a specific alien has applied for refugee admission asylum, withholding of removal under section 241(b)(3) of the Act, or protection under regulations issued pursuant to the Convention Against Torture's implementing legislation, or has received a credible fear or reasonable fear interview, or received a credible fear or reasonable fear review shall also be protected from disclosure..."

153.    Courts have interpreted 8 C.F.R. § 208.6 as prohibiting disclosure that would allow a third party, such as the Cameroonian government, to link the identity of the asylum seeker to: (1) the fact that the applicant has applied for asylum; (2) specific facts or allegations pertaining to the individual asylum claim contained in an asylum application; or (3) facts or allegations that are sufficient to give rise to a reasonable inference that the applicant has applied for asylum. *Lin v. U.S. Dep't of Just.*, 459 F.3d 255, 263 (2d Cir. 2006) (citing U.S. Citizenship and Immigration

Services, Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applicants (June 3, 2005)).[41]

154.    Besides violating a federal regulation, deportation after denial of access to baggage also violates the PBNDS, which governed the Prairieland Detention Center at the time of plaintiffs' removal.  PBNDS Standard 7.4 states that "[d]uring transport, a detainee shall ordinary have . . . in his or her possession . . . [a]ll legal material." Denial of access to a bag to remove legal material prevents people from having that material in their possession. Similarly, Standard 1.3 requires DHS to verify, before transport, that each individual "has in his/her possession all funds, valuables, and other personal property listed on the property inventory form." Additionally, Standard 2.5 provides that "property shall be returned to the detainee" prior to release or transfer.

155.    Defendants DHS and ICE violated these confidentiality policies, failed to protect Plaintiffs and subjected them to imminent risks of retaliatory violence by the Cameroonian government and non-state actors upon deportation.

### COUNT VIII:
### 5 U.S.C. § 702: Violation of the Administrative Procedure Act and *Accardi* Doctrine
### (Against Defendants DHS and ICE)

156.    Pursuant to the *Accardi* doctrine, if an agency fails to follow its own standards, "the APA (as developed by case law) gives aggrieved parties a cause of action to enforce compliance." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).  "Agencies cannot relax or

---

[41]    In this fact sheet DHS explains "public disclosure [of information contained pertaining to asylum applications] might, albeit in rare circumstances, give rise to a plausible protection claim where one would not otherwise exist by bringing an otherwise ineligible claimant to the attention of the government authority or non-state actor against which the claimant has made allegations of mistreatment." USCIS Interoffice Memorandum re: Fact Sheet on Confidentiality (June 15, 2005), https://www.uscis.gov/sites/default/files/document/fact-sheets/fctsheetconf061505.pdf.

modify regulations that provide the only safeguard individuals have against unlimited agency discretion." *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003).

157.    Plaintiffs suffered solitary confinement placements, pepper spray, impermissible use of restraints, and denials of healthcare while detained at Pine Prairie and during the deportation process.

158.    Defendants DHS and ICE failed to comply with and ensure compliance with their own policies regarding removals, hunger strikes, use of force, segregation, and health care, as set out in the PBNDS. Defendants' failure to act was a final agency action that caused Plaintiffs injuries in fact.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court:

> (1) award Plaintiffs all available compensatory damages in an amount to be proven at trial;
>
> (2) declare that the conduct of Defendants DHS and ICE, as alleged in the Complaint, violated their own agency policies and regulations and thus violates the Administrative Procedure Act;
>
> (3) order the Defendants to allow Plaintiffs to renew their asylum claims in light of the unlawful disclosure of their confidential information;
>
> (4) award attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and
>
> (5) grant such other relief as the Court deems just and equitable.

Dated: January 31, 2024

*Respectfully submitted,*

/s/Samah Mcgona Sisay
Samah Mcgona Sisay (D.D.C. Bar # NY0567)
Baher Azmy (D.D.C. attorney admission pending)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: 212-614-6484
E: ssisay@ccrjustice.org
E: bazmy@ccrjustice.org

Caitlin J. Sandley (admitted *pro hac vice*)
CENTER FOR CONSTITUTIONAL RIGHTS
P.O. Box 486
Birmingham, AL 35201
Tel: 212-614-6443
E: csandley@ccrjustice.org

William Alan Wright (Texas Bar No. 22062700)*
John D. Robinson (Texas Bar No. 24116977)*
KILPATRICK TOWNSEND & STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX USA 75201
Tel: 214-922-7131
Tel: 214-922-7151
E: alan.wright@ktslaw.com
E: john.robinson@ktslaw.com

Dustin T. Greene (NC Bar No. 38193)*
Jason M. Wenker (NC Bar No. 36076)*
Elizabeth L. Winters (NC Bar No. 44918)*
KILPATRICK TOWNSEND & STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Tel: 336-607-7432
Tel: 336-607-7416
Tel: 336-607-7345
E: dgreene@ktslaw.com
E: jwenker@ktslaw.com
E: bwinters@ktslaw.com

Ronald L. Raider (DC Bar No. 412978)*
Amanda Brouillette (GA Bar No. 880528)*
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA USA 30309
Tel: 404-532-6909
Tel: 404-685-6775
E: rraider@ktslaw.com
E: abrouillette@ktslaw.com

Sarah T. Gillman (D.D.C. Bar #NY0316)
ROBERT F. KENNEDY HUMAN RIGHTS
88 Pine St., 8th Fl., Ste. 801
New York, NY 10005
T: 646-289-5593
E: gillman@rfkhumanrights.org

Sarah E. Decker (D.D.C Bar #NY0566)
ROBERT F. KENNEDY HUMAN RIGHTS
1300 19th Street NW, Suite 750
Washington, D.C. 20036
Tel: 908-967-3245
E: decker@rfkhumanrights.org

Fatma E. Marouf (D.D.C. Bar #TX0075)
Sara Zampierin (D.D.C. Bar # TX0074)
CIVIL RIGHTS CLINIC & IMMIGRANT RIGHTS
CLINIC, TEXAS A&M SCHOOL OF LAW**
307 W 7th St., Suite LL50
Fort Worth, TX 76102
T: 817-212-4123
E: fatma.marouf@law.tamu.edu
E: sara.zampierin@law.tamu.edu

*Attorneys for Plaintiffs*

\* *Pro hac vice* application forthcoming

\*\* Plaintiffs in this case are represented by clinics
operated by Texas A&M University School of Law,
but this document does not purport to present the
school's institutional views, if any.